UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DENNIS BUCHANAN, | ) |
| Plaintiff, | ) |
| | ) No. 3:11-CV-00265 |
| v. | ) Judge Brown |
| | ) |
| CITY OF MT. JULIET, | ) |
| Defendant. | ) |

## MEMORANDUM

The plaintiff brought this action under the American with Disabilities Act (ADA), 28 U.S.C. §§ 1331 and 1343(a)(4), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, and the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206(a), 207(a). (DE 1, 33) The defendant ("the City") has filed a Motion for Summary Judgment ("the City's Motion" or "its Motion")(DE 48), the plaintiff has filed a Response (DE 75), and the City has filed a Reply (DE 84). The City's Motion is properly before the court.

### I. BACKGROUND

The plaintiff is the former Director of Parks and Recreation for the City of Mt. Juliet. (DE 1, ¶ 5, p. 2) The plaintiff injured his back on June 21, 2008 while performing manual labor with one of his crews. (DE 1, ¶ 12, p. 4) Doctor Jack Kruse, M.D., who treated the plaintiff immediately following his injury, permitted the plaintiff to return to work on July 30, 2008 with the following restrictions under Workers' Compensation ("Workers' Comp."): lifting not to exceed fifteen (15) pounds, no repetitive lifting, no bending or stooping, and no working higher than twelve (12) feet off the ground. (DE 1, ¶¶ 14-16, p. 4) The plaintiff worked in his Director's position with these restrictions from July 30, 2008 to May 14, 2009. (DE 1, ¶ 16, p. 4)

Doctor Kruse referred the plaintiff to Dr. Peter Kroll, M.D. in September 2008 who, in turn, kept the same restrictions in effect. (DE 1, ¶ 17, p. 4) Doctor Kroll treated the plaintiff throughout

the remainder of the period in controversy. (DE 64, p. 25)[1] Nurse Christie Callea was employed to be the plaintiff's case manager by the City's Workers' Comp. carrier. (DE 52, ¶ 8, p. 2; 49, pp. 3-4) The plaintiff received a performance evaluation on March 2009 while under Dr. Kroll's care that showed that he met the requirements for his position as Director of Parks and Recreation. (DE 1, ¶ 17, p. 4; DE 53, Ex. 1)

The plaintiff continued to work for nearly a year, taking time off when the pain was most severe. (DE 49, p. 3)[2] Doctor Kroll recommended in January 2009 that the plaintiff undergo a Spinal Cord Stimulator (SCS) trial to see if that would help the plaintiff manage his pain and reduce his need for medication. (DE 49, p. 3)[3] The SCS trial was successful, and the plaintiff elected to have surgery to implant a permanent SCS. (DE 1, ¶ 19, p. 5; 49, p. 3) The procedure involved implanting a battery pack under the plaintiff's ribs, with electrical leads running to both sides of his spine. (DE 49, p. 3) The plaintiff's last day at work was the day prior to the SCS implant surgery performed on June 17, 2009. (DE 1, ¶ 19, p. 5; 49, p. 3)

---

[1] The City has not complied with LR7.03(a), Local Rules of Court which requires that "all pages . . . be numbered at the bottom," and that "[a]ll exhibits to pleadings . . . be paginated progressively beginning with the principal document, and continu[e] through the last page of the document, including exhibits." The page numbers cited herein are to the original page numbers appearing on the documents cited.

[2] The plaintiff does not object to the statement of facts in the Defendant's Memorandum in Support of Its Motion for Summary Judgment ("the City's Memorandum" or "its Memorandum"), apart from claiming that the facts are incomplete. (DE 75, p. 2) Absent objection, those facts in the City's Memorandum are taken as factually accurate for purposes of summary judgment.

[3] The City makes not less than twenty-two (22) references to Dr. Kroll's deposition in its Memorandum. (DE 49, pp. 3-9, 12, 20-22, 36-39, 42, 47, 50-52, 57, 59, 67-68, 71) However, apart from a 10-page excerpt from that deposition (DE 64), it does not appear that the City has filed the portions of Dr. Kroll's deposition that correspond to any of those references. The plaintiff has, for his part, filed a 5-page excerpt of Dr. Kroll's deposition which, once again, does not correspond to the references made in the City's Memorandum. (DE 79, Attach. 2) Moreover, the page numbers on the exhibits to Dr. Kroll's deposition filed separately under seal (DE 67) do not correlate with the pages in the City's Memorandum. For the reasons explained in n. 2, above, absent objection by the plaintiff, the court will accept the City's references to Dr. Kroll's deposition as factually true for purposes of summary judgment. At the risk of encouraging even more paperwork, if a party cites to a deposition, it should include the applicable portions of the deposition in its pleadings.

The plaintiff saw Dr. Kroll on June 23, 2009 after his surgery. (DE 1, ¶ 20, p. 5; 49, p. 3) Nurse Callea informed the City after the appointment that the plaintiff would require additional time to recover, and that the plaintiff would be out of work until his next appointment with Dr. Kroll on July 13, 2009. (DE 49, p. 4)

The plaintiff advised Dr. Kroll on July 13, 2009 that the battery pack was irritating his ribs, at which time the plaintiff's date to return to work was delayed until August 10, 2009. (DE 1, ¶ 20, p. 5; 49, p. 4) At his next appointment with Dr. Kroll on August 3, 2009, the plaintiff advised Dr. Kroll that the battery back continued to irritate his ribs, whereupon Dr. Kroll decided to perform another surgery, and the plaintiff's return-to-work date was further delayed until September 3, 2009. (DE 49, p. 4)

The second surgery was performed on August 19, 2009. (DE 1, ¶ 20, p. 5; 49, p. 4) The plaintiff returned to see Dr. Kroll on August 31, 2009. (DE 49, p. 4) The nurse practitioner in Dr. Kroll's office wrote two notes to the City, the first of which said that the plaintiff could return to work on September 8, 2009; the second of which, written on September 2, 2009, restricted the plaintiff to lifting not more than twenty pounds until October 1, 2009. (DE 1, ¶ 21, p. 5; 49, p. 4) The plaintiff delivered the second note to the City the same day it was written. (DE 1, ¶ 22, p. 5; 49, p. 4)

City Manager Randy Robertson (the City Manager) and Jill Johnson (Johnson), Human Resources Director for the City, told the plaintiff on September 2, 2009 that he would have to take a functional capacity evaluation (FCE) before he would be allowed to return to work. (DE 1, ¶ 23, p. 6; 49, pp. 4-5; 52, ¶ 14, p. 4) The plaintiff took the FCE on September 9, 2009. (DE 1, ¶ 25, p. 6; 49, p. 5)

After the plaintiff took the FCE, he notified Nurse Callea that he had injured himself during

the test.  (DE 1, ¶ 27, p. 6; 49, p. 5)  On September 15, 2009, Frank Mathis, who administered the FCE, reported to the City that the plaintiff could perform his job, that he could lift up to twenty (20) pounds, that he was "fine" to walk and climb stairs, but that he should avoid working in a stooped position.  (DE 1, ¶ 28, pp. 6-7; 53 ¶ 29, pp. 10-11)

On October 8, 2009, Dr. Kroll determined that the plaintiff's post-FCE pain was due to the leads having migrated away from the plaintiff's spine.  (DE 1, ¶ 31, p. 7; 49, p. 5)  Doctor Kroll performed a third surgery on October 14, 2009 to reposition the leads.  (DE 1, ¶ 32, p. 7; 49, p. 5)  Following his next appointment, on October 23, 2009, the plaintiff was ordered not to return to work until January 14, 2010.  (DE 1, ¶ 33, p. 7; 49, pp. 5-6)

Doctor Kroll determined on January 12, 2010 that the plaintiff was at maximum medical improvement (MMI) for purposes of Workers' Comp., and that he was physically able to return to work.  (DE 1, ¶ 33, pp. 7-8; 49, p. 7)  Doctor Kroll issued the following permanent work restrictions: lifting not to exceed twenty-five pounds, no climbing ladders, and no stooping or crawling.  (DE 1, ¶ 33, p. 7-8; 49, p. 7)  Doctor Kroll also recommended against taking another FCE.  (DE 1, ¶ 33, p. 8; 49, p. 7 )  The City was notified through Workers' Comp. that the plaintiff had been cleared to return to work.  (DE 1, ¶ 34, p. 8; 52, ¶ 9, p. 3)

The plaintiff reported for work on January 14, 2010 but he was sent him home.  (DE 1, ¶ 35, p. 8; 49, p. 7)  Thereafter, the City Manager and Johnson met with the plaintiff on January 19, 2010, at which time they raised their concern about the medications he was taking.  (DE 1, ¶ 37, p. 9; 49, p. 7; 53, ¶ 36, p. 13)   The City Manager also told the plaintiff that he would have to take another FCE.  (DE 1, ¶ 37, p. 9; 49, p. 7)  The plaintiff was urged to consider whether he should apply for disability benefits, or attempt to return to work.  (DE 1, ¶ 37, p. 9; 49, p. 7)

On January 25, 2010, the plaintiff advised Johnson that he would take another FCE.  (DE 1,

4

¶ 38, p. 9; 49, p. 7) Johnson met with the plaintiff on January 27, 2010 to discuss what accommodations the plaintiff required to return to work, to which the plaintiff replied that he wanted the restrictions that Dr. Kroll had provided to take the FCE, but that he was unsure at that time what accommodations he would require to return to work. (DE 1, ¶ 39, p. 9; 49, pp. 7-8)

At this same meeting, the plaintiff asked Johnson to provide him with a copy of his job description. (DE ¶ 39, p. 9; 49, p. 8) The job description provided to the plaintiff contained a section that, among other things, required lifting up to seventy-five pounds, intermittent sitting, standing and stooping. (DE 1, ¶ 40, pp. 10-11; 52, ¶ 18, p. 5; 53, ¶¶ 7, 11-12, pp. 4-5 and Ex. 3-4)

The plaintiff, who had not yet been permitted to return to work, met with Dr. Kroll again on February 9, 2010 at which time the plaintiff decided to undergo another medical trial, this time to determine whether the installation of peripheral nerve stimulators (PNS) would reduce his reliance on medication, about which the City Manager and Johnson had expressed concern at their earlier meeting. (DE 1, ¶ 42, p. 10; 49, p. 8; 67, Ex. 4, 97 of 167) The plaintiff did not notify the City of the new trial, relying instead on Nurse Callea who had been hired by Workers' Comp. as the his case manager to do so. (DE 49, p. 8)

The PNS system trial began on March 3, 2010. (DE 49, p. 9; 67-4, p. 91 of 167) The plaintiff returned to see Dr. Kroll on March 9, 2010 at which time it was determined to permanently implant the PNS system. (DE 67-4, p. 87 or 167) The actual surgery to implant the PNS system was performed on March 18, 2010. (DE 1, ¶ 43-44. pp. 10-11; 67-4, p. 87 of 167)

The City Manager met with the plaintiff on March 26, 2010, at which time he terminated the plaintiff's employment. (DE 1, ¶ 45, p. 11; 49 p. 9) The City Manager advised the plaintiff that he had the right to appeal his termination. (DE 49, pp. 9-10 ) The plaintiff exercised that right. (DE 49, p. 10; 54, Ex. 2; 75 p. 13)

5

The plaintiff and the City entered settlement negotiations prior to the hearing on the plaintiff's appeal. (DE 49, p. 10; 75 p. 13) During the course of those negotiations, the plaintiff's initial attorney revealed that the plaintiff had secretly recorded several conversations with the City Manager. (DE 75, p. 13) The City Manager sent the plaintiff a second termination letter with the taping incident identified as additional grounds for his firing. (DE 49, p. 10; 53, ¶ 50, p. 17; 75, p. 13)

The plaintiff's appeal was heard by City's Board of Commissioners ("the Board") on April 26, 2010, with the proceedings continuing until after midnight, at which time the hearing was continued until Saturday May 8, 2010 at 10:00 a.m.. (DE 49, p. 10; 54, Ex. 3, pp. 6-7) On Wednesday April 28, 2010 at 5:45 p.m., the Board sent an e-mail to the plaintiff's attorney notifying her that the meeting had been moved up to Sunday, May 2, 2010 at 5:00 p.m., with "findings of fact and conclusions of law [due] by 5:00 p.m. on Friday" April 30, 2010. (DE 78-3, Ex. 1, p. 2)

The plaintiff's attorney sent an e-mail to Chief Administrative Law Judge (ALJ) Tom Stovall at 8:14 a.m. on Thursday April 29, 2013 appealing the change, advising the ALJ that the plaintiff was unavailable, explaining that she was going to be attending a legal conference out of town from Friday through Monday and that, as a consequence, neither she nor the plaintiff would be able to attend the hearing. (78-3, Ex. 1, p. 1) The ALJ, whose assistance the Board had requested because of the quasi-judicial nature to the proceedings, sent an e-mail to the Board that same afternoon at 5:22 p.m. urging the Board – unsuccessfully – to reconsider its decision. (DE 78-3, Ex. 2) The Board reconvened at 5:00 p.m. on Sunday May 2, 2010, and voted to affirm the City Manager's decision to fire the plaintiff. (DE 55, pp. 31-32)

The plaintiff filed a Charge of Discrimination with the EEOC on July 10, 2010 alleging that the City violated his rights under the ADA and ADEA. (DE 1, Ex. 1) The plaintiff received a Right

6

to Sue Letter from the EEOC on January 14, 2011. (DE 1, Ex. 2)

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper if, after viewing the evidence, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Alman v. Reed*, 703 F.3d 887 (6th Cir. 2013)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and Fed.R.Civ.P. 56(a)). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When faced with a properly-supported motion for summary judgment, the non-movant must provide "significant probative evidence" to defeat the motion. A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the non-moving party. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012)(citing *Anderson*, 477 U.S. at 252). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *McBride v. Acuity*, 2013 WL 69358 *2 (6th Cir. 2013)(quoting *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996)(citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986)).

"The court need consider only the cited materials, but **it may consider other materials in the record**." Rule 56(c)(3), Fed. R. Civ. P. (emphasis added) In reviewing the record at the summary-judgment stage, the courts must <u>not</u> make credibility determinations, weigh the respective value of evidence, or resolve material factual disputes. *Alman*, 703 F.3d at 887. In analyzing the

7

evidence offered, the courts must draw all reasonable inferences in favor of the non-moving party; however, that does not mean that the courts must credit and accept the non-movant's characterization of an otherwise disputed factual occurrence that affects a legal determination. *Id*. When faced with such a dispute regarding a material fact, the courts must send the case to a jury. *Id*.

### B. Plaintiff's Claims Under the ADEA and the FLSA

The plaintiff, through counsel, has noticed the court that he has abandoned his claims under the ADEA and FLSA. (DE 75, p. 2) Therefore, the City's Motion (DE 48) will be **GRANTED** as to these claims, and the plaintiff's ADEA and FLSA claims will be **DISMISSED** with **PREJUDICE**.

### C. Plaintiff's ADA Claim

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines "discriminate" to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business. *Id*. § 12112(b)(5). To establish a *prima facie* case of discrimination under the ADA, the plaintiff must show that: 1) he is disabled; 2) he is otherwise qualified for the position, either with or without reasonable accommodation; 3) he suffered an adverse employment action; 4) the employer knew, or had reason to know, he had a disability, and 5) he was discharged under circumstances that raises a reasonable inference that the plaintiff's disability was a determining factor in the adverse action taken against him. *See Whitfield v. Tennessee,* 639 F.3d 253, 259 (6th Cir. 2011).

The plaintiff's ADA claim is analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S.792 (1973). Under this framework, the plaintiff must establish a *prima facie* case of discrimination based on his disability. *Whitfield*, 639 F.3d at 258-59.

8

Once done, the burden of production then shifts to the employer to articulate legitimate, non-discriminatory reasons for the challenged action. *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012)(internal citations omitted). If the employer articulates legitimate, non-discriminatory reasons for terminating the plaintiff's employment, then the burden shifts back to the plaintiff to show that the reasons offered by the employer were not the true reasons, but a mere pretext for discrimination. *Id.* The plaintiff may establish that the employer's proffered reason is mere pretext by establishing that it: 1) has no basis in fact; 2) did not actually motivate the plaintiff's termination; or 3) was insufficient to warrant the plaintiff's termination. *Id.* With respect to the last factor, the plaintiff's burden is to produce sufficient evidence from which a jury may reasonably reject the employer's explanation and infer discrimination. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

The City has articulated in its Motion what appear to be legitimate, non-discriminatory reasons for firing the plaintiff. The burden now shifts back to the plaintiff to establish that there is a genuine issue of material fact with respect to those reasons, *i.e.*, that the City's proffered reasons are a mere pretext for discrimination.

### 1. Disability

The City concedes that the plaintiff "was disabled when he was terminated on March 26, 2010 because he was not able . . . to perform his duties for the city." (DE 49, p. 53) There also is no dispute that the City fired the plaintiff. Therefore the only issues are whether the plaintiff was qualified to perform for the position that he held prior to his termination with reasonable accommodations, and whether the circumstances of his discharge would raise a reasonable inference that the plaintiff's disability was a determining factor in the City's decision to fire him.

### 2. Qualification to Perform the Work

9

There seems little doubt from the record that the plaintiff was not qualified to perform the work required of his former position without accommodation. Therefore, the question is whether the plaintiff could have been qualified to performed the work <u>with</u> reasonable accommodation.

The City argues the issue of accommodation largely in the context of their right to conduct a second FCE before allowing the plaintiff to return to work which, according to the record, the plaintiff agreed to take. (DE 49, pp. 11-61) More particularly, the City argues that what it did, and what it did not do, was appropriate under the law. Totally absent from the City's argument, however, is any discussion of the ADA's mandatory requirement to engage in the interactive process in "good faith." Although the plaintiff does not use the expressions "good faith" or "bad faith," that is precisely his argument – that the City did not act in "good faith" from January 14, 2010 when he reported for work but was sent home and March 26, 2010, when the City Manager fired him.

The ADA requires that an employer engage in the interactive process with a disabled person in determining whether reasonable accommodations exist. *Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013). "The duty to engage in the interactive process . . . is **mandatory** and 'requires communication and **good-faith** exploration of possible accommodations.'" *Id*. (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) and citing 29 C.F.R. § 1630.2(o)(3))(emphasis added). An employer acts in "good faith" when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the employee. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010)(citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008). Claims premised on an employer's failure to offer a reasonable accommodation, if proven, falls within the ADA's definition of discrimination. *See Kleiber*, 485 F.3d at 868.

It appears from the record that, in the two-plus months from January 14, 2010, when the

10

plaintiff reported to work but was sent home, until March 26, 2010, when the City Manager terminated the plaintiff's employment, the City engaged in the interactive process just once with the plaintiff, *i.e.*, on January 27, 2010. A reasonable person could conclude from this alone that the City did not engage in the interactive process with the plaintiff in "good faith" as required under the ADA.

If a party obstructs the process, or otherwise fails to participate in "good faith," the "'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Kleiber*, 485 F.3d at 871. Although failure to engage in "good faith" in the interactive process does not create an independent ground to support an ADA violation beyond the standard reasonable-accommodation analysis, an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in "good faith" in the interactive process. *Lafata v. Church of Christ Home for Aged*, 325 Fed.Appx. 416, 423 (6th Cir. 2009).

The court notes here that, in performing a reasonable-accommodation analysis under the ADA, it is the plaintiff's duty to propose an accommodation that is objectively reasonable to employers generally. *Wardia v. Justice and Public Safety Cabinet Dept. Of Juvenile Justice*, 2013 WL 28094 (6th Cir. 2013)(citing *Walsh v. United Parcel Serv.*, 201 F.3d 718, 726 n. 3 (6th Cir. 2000)). It is apparent from the record that the plaintiff did not propose any accommodations, objectively reasonable or otherwise. However, the plaintiff's failure to do so did not obviate the City's requirement to engage in the interactive process in "good faith." *See Keith*, 703 F.3d at 918 (reversing and remanding based on the district court's "incorrect premise" that, because the plaintiff "failed . . . as a matter of law, to propose an accommodation that was objectively reasonable, any failure by [the defendant] to engage in the interactive process did not constitute a violation of the ADA.")

11

The court finds that a genuine issue of material fact exists regarding whether the City engaged in the interactive process with the plaintiff in "good faith." Therefore, whether the plaintiff could have performed the work at issue with accommodation is a question that will be left to a jury.

### 3. Grounds for Discharge

#### a. Medical Disability

The City's overarching argument is, or course, that it did not fire the plaintiff because of his disability. The City supports that argument with the affidavits of Linda Elam, Mayor of Mt. Juliet at the time the plaintiff's employment was terminated, the City Manager, and Wilford Sellers, Edward Hagerty, and Winston Floyd, the latter three of whom were elected members of the Board at the time the plaintiff was fired. (DE 58-61) In his affidavit, the City Manager attests that he "did not consider [the plaintiff's] age or disability in making [his] decision to terminate [the plaintiff's] employment." (DE 53, ¶ 49, p. 17) The other affiants attest that they "based [their] decision" to uphold the City Manager's decision to terminate the plaintiff "solely on the evidence presented," and that they "gave no consideration to Mr. Buchanan's . . . disability." (DE 58-61, p. 3)

In his Response to the City's Motion, the plaintiff argues that was required to take a second FCE prior to going back to work, even though he had not been required to take an FCE following two previous injuries, and even though the Workers' Compensation physician had cleared him to return to work. (DE 78-1, ¶ 7, p. 2) The plaintiff also claims that his job description was altered in September 2009 while he was out of work due to his injury, and that the changes included lifting and stooping requirements did not exist in the earlier 2008 version of his job description.[4] (DE 78-3, ¶ 9, p. 2) The record shows that there is/was some uncertainty as to which version of the job

---

[4] The plaintiff makes numerous other claims in his response to the City's Motion that constitute hearsay. Hearsay may not be considered at the summary judgment level. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012)(citing *Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).

12

description actually was in effect during the time in question, and when the version that the plaintiff claims was in effect was changed to reflect "other job functions" of lifting 75 pounds or more, and "intermittent[] sitting, standing, stooping and walking . . . ."  (DE 52, ¶ 18, p. 5; 53, ¶ 12, p. 5 and Ex. 4)

The plaintiff argues next that the circumstances under which the Board handled his appeal supports his claim that the Board's actions were a mere pretext for discrimination.  As previously discussed, *supra* at p. 6, the City sent the plaintiff's attorney an e-mail at 5:45 p.m. on Wednesday announcing that the Board would conclude hearing the case in four (4) days rather than thirteen (13) days as originally agreed, and that closing arguments and briefs were due in two (2) days instead of the following week.  By the time the plaintiff's attorney received the e-mail the next morning, closing arguments and briefs were due the next day.  In support of his argument, the plaintiff provides a copy of a lengthy memorandum to the Board written by ALJ Stovall encouraging the Board in the strongest terms not to change the scheduled meeting date with such "extraordinarily short notice" which, in his view, could violate the plaintiff of his due process rights.  In that same memorandum, ALJ Stovall strongly suggested that, if he had the authority, he would order the Board not to proceed with the amended schedule.  (DE 78-5)  The plaintiff also supports his argument by drawing attention to the fact that, in addition to the "extraordinarily short notice," the consequences of which were that neither he nor his attorney attended the hearing, the Board pressed ahead with his case on May 2, 2010 despite the fact that Nashville and the surrounding counties were in the throes of the historic flood of May 1-2, 2010.  From the foregoing, a reasonable person could well wonder: "What was so urgent that the Board felt it necessary to proceed against the advice of the ALJ in the midst of a natural disaster of such historic proportions?"

In addition to the foregoing, the court notes the affidavit of Shahn Donegan filed by the City

13

in support of its Motion. (DE 56) In that affidavit, Donegan addresses the existence of a letter obtained by forensic imaging of a laptop that the plaintiff had in his possession while he was a City employee. (DE 56, Ex. A) The letter, which "appeared to have been deleted," had a create date of Thursday April 1, 2010, the week after the plaintiff was fired and advised of his right to appeal. (DE 56, p. 2) The letter purportedly shows that the City Manager said to the plaintiff, among other things: 1) that he had "'been running the park for 9 or ten months and I can't continue doing that'"; 2) that he thought the plaintiff was "'going [the disability] route 3 months ago'"; and 3) that he "'**had a lot of people with a lot of title under their names to give me instructions on this** . . . .'"[5] (DE 56, Ex. A, p. 3)(emphasis added)

For the reasons stated above, including the previous "good faith" discussion, *supra* at pp. 9-11, the court finds that a genuine issue of material fact exists with respect to whether the City fired the plaintiff because of his disability. Accordingly, this question will be put to a jury.

### b. Discharge for Secretly Recording Conversations

The City argues that the plaintiff's secret recording of conversations between he and the City Manager constitutes valid and independent grounds for discharging the plaintiff. (DE 49, p. 65; 84, pp. 4-5) The City again supports its argument with the affidavits of Mayor Elam, the City Manager, and Board members, Sellers, Hagerty, and Floyd, referred to *supra* at p. 12. The City Manager attests in his affidavit that had he know the plaintiff "tape recorded employees without their consent, [he] would have terminated [the plaintiff's] employment for this reason without consideration of any other reasons." (DE 53, ¶ 50, p. 17) Mayor Elam and Board members Sellers, Hagerty, and Floyd each attest: "In my opinion, no Director of a City Department should be allowed to continue working

---

[5] The City refers to Donegan's affidavit, and the letter attached thereto, three times in its Memorandum (DE 49, pp. 5, 24, 51), and twice in the Defendant's Statement of Undisputed Material Facts (DE 68, pp. 8, 34). Since the letter was introduced by the City in support of its Motion, it is appropriate to consider that letter with respect to what it purports to say that supports the plaintiff's position.

14

for the City when he/she knowingly committed numerous violations of the City policy prohibiting tape recording other employees." (DE 58-61, ¶ 5, p. 2)

In addition to the manner in which his appeal before the Board was conducted, the plaintiff argues that his dismissal for recording the conversations at issue constituted extraordinary punishment, and that terminating his employment for those actions was inconsistent with the City's Personnel Regulations (the Regulations). Quoting the Regulations, the plaintiff points out that, while the Regulations provide that "[f]ailure to comply" with the prohibition on recording devices "will result in prompt disciplinary action" (DE 65, p. 38; 75, pp. 13-14), those same Regulations describe the disciplinary process as "remedial and progressive rather than punitive in nature," and that "termination" of an employee is "the most serious violation of performance or conduct or as a final step in a series of progressive disciplinary actions." (DE 75, p. 14) The City does not dispute the plaintiff's reading of the Regulations in its Reply. (DE 84, pp. 4-5)

For the reasons explained above, including the issues discussed previously, *supra* at pp. 9-14, a genuine issue of material fact exists regarding whether the City's decision to fire the plaintiff for recording conversations with other City employees constitutes legitimate, non-discriminatory grounds firing him, or whether the City's action in doing so was merely a pretext for discrimination. This question will be put to a jury.

15

## III. CONCLUSION

For the reasons stated herein, the undersigned finds that genuine issues of material fact exist with respect to the plaintiff's claims. Accordingly, the City's Motion as it pertains to the plaintiff's ADA claims (DE 48) will be **DENIED**.

In ruling as it does today, the court also is adhering to time-honored philosophy in this circuit that has guided courts for more than half a century:

> [A] trial judge should be slow in disposing of a case of any **complexity** on a motion for summary judgment, that while such a judgment wisely used is a praiseworthy and timesaving device, yet such prompt dispatch of judicial business is neither the sole nor the primary purpose for which courts have been established, and that a party should not be deprived of an adequate opportunity to fully develop his case by witnesses and a trial, when the issues involved make such procedure the appropriate one. . . .

*Management Investors v. United Mine Workers of America*, 610 F.2d 384, 389 (6th Cir. 1979); *S.J. Groves & Sons Co. v. Ohio Turnpike Commission*, 315 F.2d 235, 237 (6th Cir. 1963)(emphasis added). As evidenced by the sheer magnitude City's Motion and supporting documentation,[6] this case is a very complex one and, as such, denial of the City's Motion is supported on grounds of complexity as well.

An Appropriate Order will be entered.

s/Joe B. Brown<br>
Joe B. Brown<br>
Magistrate Judge

---

[6] In addition to the City's Motion itself, the plaintiff has filed an 80-page supporting memorandum of law (DE 49), 73 pages of case law (DE 50), an 87-page statement of undisputed material facts (DE 68) with 219 facts asserted, 10 affidavits with supporting exhibits, and a Reply – totaling more than 1,800 pages. The City will recall that the court previously noted that it was "appalled" at the magnitude of the City's filing, displeased at having been presented a "fait accompli" with a request after the fact for a 55-page extension, and dismayed at such a blatant disregard for the local rules of court. (DE 69)

16